# Constitutionality of 18 U.S.C. § 1120

Congress has clear constitutional authority to proscribe killings committed by escaped federal inmates serving life sentences, as provided in 18 U S C § 1120, where the killings facilitate the escape or the avoidance of recapture.

Congress's penological and custodial interests in ensuring the incapacitation of life-sentenced federal inmates provide compelling support for the constitutionality of 18 U.S C. § 1120 even when it is applied with respect to a post-escape killing that is not related to the escape or subsequent efforts to avoid recapture.

August 31, 2000

MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

This memorandum responds to a request of the Criminal Division for our opinion concerning the constitutionality of 18 U.S.C. § 1120 (2000), which makes it a federal criminal offense, punishable by death in some cases, for an inmate serving a life sentence in a federal correctional institution to kill a person following escape from such institution. *See* Memorandum for Dawn Johnsen, Acting Assistant Attorney General, Office of Legal Counsel, from John C. Keeney, Deputy Assistant Attorney General, Criminal Division, *Re: Request Concerning 18 U.S.C. 1120* (July 6, 1998). You have asked whether this statute can survive a constitutional challenge as lying beyond Congress's Article I powers or whether, to survive such challenge, it should be amended to require that the killing in question be done to further the escape or to avoid recapture.

Title 18, section 1120(b) provides: "A person, having escaped from a Federal correctional institution where the person was confined under a sentence for a term of life imprisonment, kills another shall be punished as provided in sections 1111 and 1112." [1] Section 1111 authorizes the death penalty or life imprisonment for certain murders in the first degree and authorizes a term of years or life imprisonment for certain murders in the second degree, *see* 18 U.S.C. § 1111(b) (1994); section 1112 provides terms of imprisonment and/or fines for certain manslaughters. *Id.* § 1112(b).[2]

---

[1] Your inquiry refers to future killings or "criminal act[s]" by an escaped federal prisoner Because § 1120 applies only to killings committed by federal escapees, our assessment is limited to that category of crimes

[2] Section 1120 was enacted as a small part of the voluminous Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103–322, § 60012(a), 108 Stat 1796, 1973, and we have found no pertinent legislative history revealing the reasons prompting its passage *See generally* Violent Crime Control and Law Enforcement Act of 1994 — Conference Report, 140 Cong Rec 23,929 (1994)

We note that death sentences authorized under 18 U S C § 1120(b), like other federal death sentences, must conform to statutory standards for the consideration of individual aggravating and mitigating factors which have been held to satisfy the requirements of the Eighth Amendment *See* 18 U S.C. §§ 3591–3598 (1994 & West Supp 2000); *see, e.g., United States v. Webster*, 162 F 3d 308 (5th Cir. 1998), *cert. denied*, 528 U.S. 829 (1999) (upholding constitutionality of federal death penalty procedures). Our analysis here does not address whether particular killings covered by the statute may be eligible for the death penalty under Eighth Amendment standards, but focuses on the question whether such killings are a proper subject for federal criminal legislation in the first instance

156

On its face, § 1120 applies to all post-escape killings. We think it clear that Congress has constitutional authority to proscribe those killings which assist in either effectuating or prolonging the escape. Although the issue is novel, we also believe there is a compelling argument that Congress may proscribe and punish any other killing, even if not escape-related, that is committed by an escaped federal prisoner who has been sentenced to life imprisonment.

## I. GENERAL CONGRESSIONAL AUTHORITY TO ENSURE THE EFFECTIVE FUNCTIONING OF A FEDERAL PRISON SYSTEM

The United States Constitution clearly contemplates that Congress will enact a federal criminal code and provide for its administration. Several clauses refer either to specific federal crimes or to classes thereof. *See, e.g.*, U.S. Const. art. III, § 3, cl. 1 (defining federal crime of treason); U.S. Const. amend. V (requiring grand jury presentment or indictment for "a capital, or otherwise infamous crime"). Other clauses refer to the procedures for prosecuting or trying such crimes. *See, e.g.*, U.S. Const. art. III, § 2, cl. 3 (jury and venue requirements for the "Trial of all Crimes"); U.S. Const. amend. V (prescribing procedural safeguards for criminal prosecutions); U.S. Const. amend. VI (same). Of course, Congress has no blanket authority to enact a federal criminal code; rather, Congress may enact specific criminal statutes only insofar as the power to do so is granted or implied by Congress's enumerated powers, *see, e.g., United States v. Fox*, 95 U.S. 670, 672 (1877) ("Any act, committed with a view of evading the legislation of Congress passed in the execution of any of its powers . . . may properly be made an offence against the United States."),[3] as supplemented by the Necessary and Proper Clause,[4] *see, e.g., Knapp v. Schweitzer*, 357 U.S. 371, 375 (1958) ("penal remedies may be provided by Congress under the explicit authority to 'make all Laws which shall be necessary and proper for carrying into Execution' the other powers granted by Art. I, § 8"), or in some instances is implied by the structure and history of other constitutional provisions.[5] But whatever the

---

[3] Federal courts have upheld as within congressional authority numerous federal criminal statutes protecting or implementing a wide range of national powers. *See, e.g., United States v Lue*, 134 F.3d 79, 84 (2d Cir. 1998) (Congress validly enacted criminal legislation against hostage taking to effectuate U.S. treaty obligations under the Hostage Taking Convention); *United States v. Dittrich*, 100 F 3d 84, 87 (8th Cir 1996) (statute making it a felony to steal property from a federal Post Office "is well within" congressional authority)

[4] Congress shall have power to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers." U S Const. art I, § 8, cl. 18.

[5] *See, e.g., Ex parte Garnett*, 141 U S. 1, 12–15 (1891) (congressional power to enact or modify maritime code, as distinct from power to regulate interstate or foreign commerce, is fairly implied by historical inference and the grant of admiralty and maritime jurisdiction to Article III courts); *Prigg v. Pennsylvania*, 41 U.S. (16 Pet.) 539, 615–22 (1842) (upholding congressional power to enact legislation enforcing Fugitive Slave Clause even though Clause grants no express power to Congress); *Burroughs v. United States*, 290 U.S. 534, 544–49 (1934) (upholding Federal Corrupt Practices Act based on implied congressional power to safeguard presidential elections); *cf. United States v. Eichman*, 496 U S 310, 316 n 6 (1990) (conceding that "the Government has a legitimate interest in preserving the [United States] flag's function as an 'incident of sovereignty,'" though holding that criminalizing flag-burning does not advance this interest).

particulars, the notion that Congress may establish a federal criminal code is firmly grounded.

It is equally well established that, in addition to enacting a federal criminal code, Congress may create and maintain an effective criminal justice system to prosecute and punish criminal conduct. This Office has previously opined that Congress's constitutional authority to provide for the housing and confinement of federal pre-trial detainees rests on a broader congressional authority "to provide for an orderly federal system of criminal justice." *See Congressional Authority to Require the States to Lodge Federal Pre-Trial Detainees*, 5 Op. O.L.C. 142, 142–43 (1981). As that opinion stated:

> Although this power is not expressly enumerated in Article I, § 8 of the Constitution, the exercise of such power is necessary and proper, under Article I, § 8, clause 18, to provide for an orderly federal system of criminal justice contemplated by several other provisions of the Constitution. *See, e.g.,* Art. II, § 3 [President's authority to "take care that the laws be faithfully executed"]; Art. III, § 2, cl. 3 [provision for trial of crimes by jury in the State where committed]; Fifth Amendment [provisions for grand jury indictment, ban on double jeopardy, privilege against self-incrimination, and due process of law]; Sixth Amendment [right to speedy trial by impartial jury, compulsory process to obtain witnesses, assistance of counsel, and the Confrontation Clause]; Eighth Amendment [prohibitions against excessive bail and cruel and unusual punishment].

*Id.* This broad authority to establish and maintain an effective regime of criminal law enforcement extends to the operation of federal correctional facilities. *See, e.g., Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989) (describing the legitimacy of the federal government's interest in maintaining the security of federal prisons as "beyond question" in upholding constitutionality of regulations restricting prisoner receipt of pornography); *Ponzi v. Fessenden*, 258 U.S. 254, 262–63 (1922) (acknowledging numerous federal statutes providing the Attorney General with authority to secure and maintain the custody of inmates serving federal sentences); *United States v. Berrigan*, 482 F.2d 171, 182 (3d Cir. 1973) ("The power to fashion rules governing the movement of contraband as it relates to the federal prison system resides with Congress."); *cf. Greenwood v. United States*, 350 U.S. 366, 373–75 (1956) (the power to prosecute federal offenses entails the auxiliary authority to provide for the secure detention of an accused person who is mentally incompetent to stand trial pending possible recovery of sufficient competence); *United States v. Perry*, 788 F.2d 100, 111 (3d Cir. 1986) (where Congress has the power to prescribe criminal activities, "it has the auxiliary authority, under

the necessary and proper clause, to resort to civil commitment to prevent their occurrence'').

The test for whether § 1120 lies within Congress's implied authority is whether it is "plainly adapted" to support the legitimate ends of congressional regulation, including the safe and effective functioning of the federal penal system as well as the more specific ends (such as the regulation of interstate commerce) contemplated by Congress's enumerated powers.[6] *See, e.g., McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 408 (1819) (affirming that a government granted specific enumerated powers "must also be intrusted with ample means for their execution"); *id.* at 421 ("Let the end be legitimate . . . and all means which are appropriate, which are plainly adapted to that end . . . are constitutional."); *Burroughs v. United States,* 290 U.S. 534, 547–48 (1934) ("If it can be seen that the means adopted are really calculated to attain the end, the degree of their necessity, the extent to which they conduce to the end, the closeness of the relationship between the means adopted and the end to be attained, are matters for congressional determination alone."). The federal courts have long held that this standard requires only "that the effectuating legislation bear a rational relationship to a permissible constitutional end." *Lue,* 134 F.3d at 84.

## II. SECTION 1120'S APPLICATION TO KILLINGS RELATED TO THE INITIAL ESCAPE OR SUBSEQUENT EFFORTS TO AVOID DETECTION AND RECAPTURE

As a general matter, "the federal government has a significant and substantial interest in keeping prisoners confined and preventing them from escaping." *United States v. Evans,* 159 F.3d 908, 912 (4th Cir. 1998).[7] Your request letter assumes that Congress has the further power to criminalize killings committed by escaped life-sentenced prisoners to effectuate their initial escape or to avoid subsequent

---

[6] Section 1120 cannot be defended in its entirety as an independent exercise of Congress's expressly enumerated power to regulate interstate commerce. Section 1120 contains no jurisdictional element ensuring that any prosecuted killing affects interstate commerce, and it is difficult to argue that an escapee killing (or even escapee killings viewed cumulatively) constitutes "economic activity [that] substantially affects interstate commerce." *United States v Lopez,* 514 U.S 549, 560 (1995). *See United States v Morrison,* 529 U S 598, 617 (2000) ("We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce.")

[7] Accordingly, Congress has proscribed escapes in section 751(a) of title 18, which provides.

> Whoever escapes or attempts to escape from the custody of the Attorney General or his authorized representative, or from any institution or facility in which he is confined by direction of the Attorney General, or from any custody under or by virtue of any process issued under the laws of the United States by any court, judge, or commissioner, or from the custody of an officer or employee of the United States pursuant to lawful arrest, shall, if the custody or confinement is by virtue of an arrest on a charge of felony, or conviction of any offense, be fined under this title or imprisoned not more than five years, or both; or if the custody, or confinement is for extradition, or for exclusion or expulsion proceedings under the immigration laws, or by virtue of an arrest or charge of or for a misdemeanor, and prior to conviction, be fined under this title or imprisoned not more than one year, or both.

18 U.S.C § 751(a) (1994)

recapture ("escape-related" killings). We agree with this assumption, for the following reasons.

First, Congress plainly has a legitimate interest in punishing federal inmates who kill others (whether prison officials, law enforcement personnel, or private citizens) during their initial escape. This application of § 1120 is reasonably adapted to deterring such inmates from using potentially deadly force in the course of effecting and prolonging their escapes. Moreover, such legislation is reasonably adapted to deterring federal inmates from attempting escape in the first place. The need to commit violent acts that might result in death, at times, will be a reasonably foreseeable consequence of an escape attempt; additional penalties for such killings thus provide an added measure of deterrence against such attempts. Furthermore, Congress might reasonably determine that the imposition of death and other severe penalties is an appropriate means to deter escape and escape-related killings by inmates serving life sentences, for whom lesser sanctions would have little force.[8] Thus, as applied to killings that help to effectuate an escape, § 1120 rationally furthers Congress's legitimate interest in maintaining the efficacy and security of federal prisons.[9]

Second, Congress has a legitimate interest in punishing escapees who kill others (again, whether prison officials, law enforcement personnel, or private citizens) as a means of forestalling subsequent recapture and return to prison. Absent the threat of additional punishment, escapees who already face a "natural life sentence"[10] upon their return to the penitentiary will have much to gain and little to lose by using lethal force to frustrate a recapture attempt. Moreover, inmates considering an escape attempt can reasonably foresee the need to use lethal force to avoid subsequent recapture even if their initial attempt is successful; additional penalties for such killings thus assist in deterring such initial attempts.

This interest in deterring recapture-avoiding killings is not limited to killings that frustrate a specific effort by law enforcement officials to bring the escapee into custody, but more broadly includes killings designed to prevent the escapee's

---

[8] It might be argued that the deterrent effect of the *non-capital* penalties authorized under § 1120 is only marginal when applied to inmates already serving life sentences The imposition of an additional sentence, however, may have substantial impact where, for example, the inmate nurtures some hope of obtaining reversal of his first life sentence through further appeals, or the inmate nurtures some hope of early release The resulting deterrence thus provides a rational basis for the non-capital penalties § 1120 provides

[9] Indeed, with respect to this application, § 1120 largely overlaps with 18 U S C. § 1111 (1994), which makes a killing committed during the "perpetration of . any . escape" a species of felony-murder when it occurs "[w]ithin the special maritime and territorial jurisdiction of the United States " In 1984, Congress added escape and some other crimes to the statutory list of felonies triggering the federal felony-murder rule precisely because Congress thought that escape and the other added crimes "pose as great if not a greater threat to human life than the four already listed." S. Rep. No 98–225, at 311 (1983)

[10] The statutory definition of "life imprisonment" includes "a sentence for the term of natural life, a sentence commuted to natural life, an indeterminate term of a minimum of at least fifteen years and a maximum of life, or an unexecuted sentence of death." 18 U.S C § 1120(a), *id.* § 1118(b) Thus some escapees could violate § 1120 even though it had not been definitively determined at the time of the violation that they would remain incarcerated for the rest of their lives Some of § 1120's deterrent effects discussed in the text do not apply as forcefully to such individuals To clarify the discussion, we use the term "natural life sentence" to refer to a sentence that clearly requires an inmate to remain imprisoned for the rest of his life

status from even being discovered by such officials. Well after a successful escape, an escapee might divulge his history and wanted status to a friend or co-worker, and then later learn there is reason to fear the confidant will intentionally turn him in or perhaps even unintentionally give his identity away. Or the escapee might keep his identity and past a secret, but nevertheless worry that a friend or co-worker has become suspicious and is on the verge of discovering his status as a fugitive from justice. Perhaps most commonly, the escapee might subsequently engage in some illegal conduct (say, robbing a liquor store) and worry that a witness's description will lead to his arrest, which eventually will lead authorities to discover his wanted status. In each of these and similar circumstances Congress might reasonably conclude that, absent § 1120, an escapee already subject to a natural life sentence upon recapture would have little to lose and much to gain by killing the friend, co-worker, or witness before she wittingly or even unwittingly brings the escapee's status to the attention of the authorities. Indeed, this incentive to kill to avoid detection is a product of the federal sentencing regime itself. Absent § 1120, the escapee would know that detection would lead to his return to prison for life, and that a killing to avoid detection would lead (as a practical matter) to the very same punishment under federal law; thus absent § 1120 it would be rational for the escapee to kill in order to reduce the risk of detection.[11] Surely Congress has a legitimate interest in counteracting the perverse incentive that life imprisonment terms otherwise create, by imposing an additional sanction for detection-avoiding killings.

Thus, Congress has an interest in proscribing escapee killings that are connected to the initial effort to escape or subsequent efforts to remain at large. Criminal regulation of killings in these circumstances falls comfortably within Congress's authority to protect and effectuate its enumerated Article I powers through maintenance of an effective criminal justice and penal system.

## III. SECTION 1120'S APPLICATION TO KILLINGS UNRELATED TO THE INITIAL ESCAPE OR SUBSEQUENT EFFORTS TO AVOID DETECTION AND RECAPTURE

Your inquiry concerns application of 18 U.S.C.A. § 1120 to killings that are unrelated to the initial effort to escape or subsequent efforts to avoid recapture or remain undetected ("non-escape-related" or "unrelated" killings). For example, § 1120 could encompass a killing that occurs many years later during a domestic dispute or a drunken barroom brawl. You have inquired whether § 1120's application to such non-escape-related killings is constitutionally permissible. The novel question presented is whether this statutory application is ration-

---

[11] This calculus could be different in circumstances where the escapee has strong reason to believe that his killing to avoid detection would be punished by death pursuant to a state law criminal prosecution It is plainly reasonable, however, for Congress to ensure that the federal sentencing scheme does not create incentives for escaped life prisoners to kill in those states that do not authorize the death penalty for such killings

ally related to a legitimate federal interest, or, if not, whether the statute's overbroad coverage can nevertheless be justified.[12]

We note at the outset that the rationales discussed in Part II supporting congressional authority to proscribe escape-related killings do not persuasively extend to unrelated killings. For example, the deterrence justification supporting § 1120's application to killings that assist in the initial escape or thwart subsequent recapture does not provide a plausible rationale for § 1120's application to killings unrelated to escape. By definition, penalizing such unrelated killings will not encourage escapees to take greater precautions to avoid using deadly force during efforts to escape or avoid recapture. Moreover, penalizing unrelated killings will likely have little influence in discouraging federal inmates from attempting to escape in the first place. While inmates might reasonably foresee the need to use deadly force while escaping and forestalling recapture, they are less likely to foresee a need to use deadly force outside of these moments, and thus the extra sanction for doing so would not form part of their escape-planning calculus. Unlike additional sanctions for escape-related killings, then, additional sanctions for unrelated killings would likely have little effect on either decisions to escape or the use of care in doing so.

Moreover, federal life sentences do not create any perverse incentive for escapees to commit non-escape-related killings when they are otherwise minding their own business and not in fear of being detected and subsequently recaptured. To the contrary, a successful escapee has every incentive not to kill unless his detection is imminent, because the killing itself would attract attention and make discovery of his fugitive status more likely. Accordingly, § 1120's sanctions for such unrelated killings cannot be upheld on the theory that they eliminate a perverse incentive to kill otherwise created by a natural life sentence.

Nevertheless, we believe a compelling case can be made that the federal government has a legitimate penological interest in ensuring that an escaped life-sen-

---

[12] If a particular defendant charged with violating § 1120 has committed an escape-related killing, a court will probably not allow that defendant to challenge § 1120 on the ground that it is unconstitutional as applied to non-escape-related killings. Outside of the First Amendment and perhaps a few other contexts where courts are particularly concerned about an overbroad statute's chilling effect on constitutionally protected behavior, "[t]he traditional rule is that 'a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court.'" *Los Angeles Police Dept. v. United Reporting Publ'g Corp.*, 528 U S. 32, 38 (1999) (citations omitted). The Supreme Court has applied this approach in cases concerning congressional power as well as those concerning individual rights *See, e.g., United States v. Raines*, 362 U.S. 17, 20–22 (1960) (precluding state official from challenging Congress's authority pursuant to Section Two of the Fifteenth Amendment to proscribe race-based interference with statutory voting rights on the ground that the proscription unconstitutionally applied to private citizens as well as state officials), *Salinas v. United States*, 522 U.S. 52, 61 (1997) (when application of statutory provision in a specific case "did not extend federal power beyond its proper bounds," Court did not inquire whether provision exceeded Congress's power with respect to its "application in other cases")

However, a defendant whose conduct arguably is non-escape-related may challenge the statute as lying beyond Congress's authority, such a defendant would be arguing that the statute cannot constitutionally be applied to him personally As a practical matter, since § 1120 does not now require a prosecutor to prove as an element of the offense that the killing is escape-related, it may be unclear whether the killing can be so described (unless, for example, the evidence demonstrates clearly that the killing occurred during the initial prison break) If it is unclear, the defendant would likely have standing to challenge § 1120's breadth

tenced prisoner does not threaten the public's safety through violent criminal behavior during the entire period he remains at large. Once an individual has been charged, tried, and duly convicted of a federal offense, the federal government acquires a strong penological interest in regulating that individual's subsequent behavior so as to promote society's welfare. Congress may authorize the executive to seek, and the judiciary to impose, a wide range of criminal sentences designed to achieve such diverse goals as retribution, rehabilitation, general deterrence, specific deterrence, and incapacitation. This latter interest in incapacitation is designed to protect the public from further criminal activity by the particular inmate during his term of punishment. *See, e.g., United States v. Brown*, 381 U.S. 437, 458 (1965) ("One of the reasons society imprisons those convicted of crimes is to keep them from inflicting future harm . . . ."). This interest is particularly strong with respect to a life-sentenced inmate, since Congress and other actors in the criminal justice system have deemed it appropriate to sequester him from the public for the remainder of his life.[13]

The federal government's powerful interest in preventing a life-sentenced inmate from endangering the public does not dissipate simply because the inmate manages to escape the confines of federal custody. To the contrary, all of Congress's legitimate penological objectives are undermined each and every day that an escaped federal prisoner remains at large, since each day free undermines the sentence's retributive, rehabilitative, and deterrent value and, most relevantly, directly thwarts the goal of public protection through incapacitation. For this very reason, the Supreme Court has characterized escape from federal prison as a "continuing offense" rather than one which is completed the moment escape is effectuated:

> [W]e think it clear beyond peradventure that escape from federal custody as defined in § 751(a) is a continuing offense and that an escapee can be held liable for failure to return to custody as well as for his initial departure. *Given the continuing threat to society*

---

[13] This point holds even for those inmates for whom it had not been definitively determined that they would remain incarcerated for the rest of their natural lives (i.e., inmates not subject to a "natural life sentence," *see supra* note 10). For such inmates, society has still determined that their crimes merit a maximum of life imprisonment, and their sentences would permit the possibility of such a fate.

One might query whether Congress has a legitimate interest in protecting the public from all violent recidivism or only from those violent acts that independently violate federal (as opposed to state) law. While we have found no case law directly on point, we *think the better view is that, once a person is duly charged and convicted of a federal offense*, Congress's valid penological interests in incapacitating, deterring, and even rehabilitating that person extend to all dangerous aspects of her behavior. We note that federal courts have long considered state-law offenses as relevant factors in determining the appropriate sentence for federal criminal activity, *see, e.g., United States v. Carroll*, 3 F.3d 98, 101–03 (4th Cir. 1993), and similarly federal courts have long required federal convicts sentenced to probation or released on parole to refrain from subsequent state-law offenses as a condition of their continued release.

Moreover, as a practical matter, federal prosecution and incarceration often preempt state prosecution and incarceration of the same offender for the same or related conduct. If the federal government had not incarcerated (and then let escape) a particular offender, she might well have been incarcerated in state prison during the period of the federal escape and thus have been incapable of committing state-law crimes. Arguably, the preemptive effect of federal prosecution gives Congress an interest in and even responsibility to prevent that offender from engaging in further harmful conduct that violates state law during her federal term of imprisonment.

> *posed by an escaped prisoner,* "the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one."

*United States v. Bailey,* 444 U.S. 394, 413 (1980) (emphasis added; citation omitted). Thus, "every day away from custody serves as a 'continuing threat to society,' and until recapture or surrender is an ongoing act of escaping." [14]

The continuing nature of the relationship between the escapee and the federal government can be viewed from the government's perspective as well. "A prisoner who has escaped from the custody of a sovereign remains in the 'constructive custody' of that sovereign." *Potter v. Ciccone,* 316 F. Supp. 703, 706 (W.D. Mo. 1970). Not only does this constructive custodial relationship give the government a continuing interest in the escapee's activities, but the government's earlier failure to maintain its physical custody over the inmate arguably places it under a special responsibility to recapture the escapee and to ensure the public's safety during the interim.

We believe that this confluence of penological and custodial interests supports the conclusion that Congress has the constitutional authority to proscribe and punish all killings by escaped life-sentenced prisoners, even those lacking a direct nexus to either the initial effort to flee or subsequent attempts to avoid detection and recapture. Every killing committed by an escaped life-sentenced prisoner frustrates the original life sentence's purpose of protecting the public from dangerous recidivism through incapacitation — and does so in the most egregious manner possible. Moreover, both the convict's continued commission of the escape and the federal government's initial failure in maintaining physical custody are contributing causes in the event of any subsequent killing by the escapee. Under these circumstances, the government's ongoing constructive-but-no-longer-physical custody gives it strong reason to secure its penological objectives pending recapture. As a result, Congress has a legitimate interest in deterring such escapee killings, and prosecuting and punishing such killings as federal crimes distinct from the underlying and continuing offense of escape is plainly adapted to that end.

A supportive, albeit imperfect, analogy can be drawn between Congress's interest in proscribing escapee killings by life-sentenced inmates and Congress's well-established interest in imposing release conditions on inmates given lesser sentences. Congress has long authorized courts to sentence certain offenders to

---

[14] *United States v. Audinot,* 901 F 2d 1201, 1203 (3d Cir. 1990) (citation omitted); *see also, e.g , United States v Tapia,* 981 F.2d 1194, 1196 (11th Cir. 1993) (same); *United States v. Lopez,* 885 F 2d 1428, 1435 (9th Cir. 1989) (same).

We do not mean to suggest that, given this characterization of escape as a "continuing offense," every post-escape killing is properly considered an instance of felony-murder on the theory that the killing occurred "during" the escape. For purposes of 18 USC § 1111, which includes a felony-murder provision criminalizing "[e]very murder . . . committed in the perpetration of, or attempt to perpetrate, any escape," the temporal duration of an escape's "perpetration" may not extend this far. The "continuing offense" characterization does, however, appropriately emphasize the extent to which each day of unlawful freedom undermines the penological objectives of the original sentence, particularly the objective of protecting the public from dangerous recidivist acts

terms of probation, subject to their compliance with various conditions on their conduct; violation of these conditions can result in revocation of the offenders' probationary status.[15] Congress has also long authorized periods of supervised release (formerly called parole) following the completion of a term of imprisonment, again subject to various conditions on behavior.[16] One condition that must be imposed under either release regime is that the released offender commit no further state or local (as well as federal) crimes.[17] In addition, sentencing courts frequently impose discretionary conditions on particular offenders that might well lie beyond Congress's authority to impose on the general population.[18] Imposing such discretionary conditions is considered appropriate where doing so furthers the federal government's legitimate penological interests in deterrence, incapacitation, and rehabilitation.[19] Given the historical pedigree of these release regimes, we believe that Congress's authority to impose such conditions as part of a general sentencing scheme is beyond serious dispute and may safely serve as a benchmark for the scope of congressional power.[20] The assumed constitutional foundation for the regimes is that Congress acquires a legitimate penological interest in regulating the behavior of federal convicts released on probation or parole, even if absent the conviction Congress could not similarly regulate the same behavior.

---

[15] Permissible probation conditions are currently specified by section 3563(b) of the Sentencing Reform Act of 1984, Pub. L No. 98–473, 98 Stat. 1993 (1984) (codified as amended 18 U S C. §§ 3551–3742 (1994 & West Supp ))

[16] Section 3583 of the Sentencing Reform Act of 1984 codifies sentencing courts' authority to impose discretionary conditions of supervised release following imprisonment Under the earlier parole system, the parole board could release an inmate on a supervised basis before the inmate's sentence was fully served, but any conditions of release terminated when the inmate's original sentence terminated. Under the newer system of supervised release, an inmate must serve the full term of imprisonment as originally sentenced, and if the sentencing court deems it necessary, an additional term of supervised release.

[17] *See* 18 U S C § 3563(a) ("The court shall provide, as an explicit condition of a sentence of probation — (1) for a felony, a misdemeanor, or an infraction, that the defendant not commit another Federal, state, or local crime during the term of probation "), *id* § 3583(d) ("The court shall order, as an explicit condition of supervised release, that the defendant not commit another Federal, State, or local crime during the term of supervision . . ."). *Cf Johnson v United States*, 529 U S 694 (2000) (case involving supervised release revocation when offender committed state-law forgery offenses)

[18] *See, e.g., United States v. Tonry*, 605 F.2d 144 (5th Cir 1979) (upholding condition preventing offender from running for state political office); *United States v Martinez*, 988 F. Supp 975 (E.D. Va 1998) (upholding condition restricting offender's driving activities).

[19] *See, e.g., United States v Schave*, 186 F.3d 839, 841 (7th Cir. 1999):

> The district court may impose a specific condition of supervision so long as the condition. (1) is reasonably related to specified sentencing factors, namely the nature and circumstances of the offense and the history and characteristics of the defendant; (2) is reasonably related to the need to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner, (3) involves no greater deprivation of liberty than is reasonably necessary to achieve these goals; and (4) is consistent with any pertinent policy statements issued by the Sentencing Commission.

*See also id.* at 844 (condition is permissible if it "reasonably serves the aim of preventing [the offender] from repeating his criminal activities and of protecting the public from potential recidivism").

[20] We have found no case considering a challenge to Congress's Article I power to authorize a sentencing court to impose the "violate no state law" condition or another condition that Congress could not impose on the general public A few cases have rejected more specific federalism-based challenges to the imposition of probation or release conditions. *See, e g., Tonry*, 605 F.2d at 148–50 (rejecting claim that condition prohibiting offender from running for state political office unconstitutionally intruded upon state's prerogative to supervise its own elections) Such cases at least imply that the imposition of such conditions lies within Congress's Article I authority.

This benchmark supports the constitutionality of § 1120. If Congress has a legitimate penological interest in regulating the conduct of convicts who are lawfully released either instead of or after serving a prescribed term of imprisonment, *a fortiori* Congress has a legitimate penological interest in regulating the conduct of convicts who *unlawfully release themselves* prior to completion of their imprisonment terms. Escaped convicts pose the same if not greater dangers to public safety during their period of unlawful release, and the fact that any future killing occurs during their ongoing commission of the "continuing offense" of escape makes the federal interest in deterring such behavior seem all the more substantial.

We recognize that § 1120 and the probation and supervised release regimes are not on all fours. When an offender violates a condition of her probation or release, she does not thereby (necessarily or even usually) commit a new federal crime, and the revocation of her probation or release is not considered a punishment for such new misconduct. Rather, the "additional" penalty imposed is considered part of the original, conditional sentence for the underlying offense.[21] The source of congressional power to impose this "additional" penalty, therefore, is the same as the source of congressional power to impose the fixed aspects of the original sentence, to wit: either an enumerated or implied power to govern individual conduct or the Necessary and Proper Clause applied in relation thereto. *See supra* Part I. For example, Congress's power to impose both imprisonment and probation conditions on an offender convicted of counterfeiting stem directly from Congress's Article I authority to "provide for the Punishment of counterfeiting the Securities and current Coin of the United States." U.S. Const. art. I, § 8, cl. 6. By contrast, § 1120 makes post-escape killing an entirely new crime subject to a new criminal sanction, rather than a post conviction event that modifies the original life sentence for the original crime. One might argue, therefore, that Congress's power to punish post-escape killings cannot similarly be considered to flow directly from its power to impose the underlying life sentence in the first place. If so, then unlike the probation and supervised release statutes, § 1120 must be defended as an appropriate means of serving a *generalized* penological interest — precluding escapes from thwarting the incarceration objectives of life imprisonment — rather than as an appropriate means of serving the *specific* penological objective of punishing the original underlying offense. In this sense, while both § 1120 and the probation and supervised release statutes operate to regulate the outside-prison conduct of persons serving federally imposed sentences (including some conduct that lies beyond Congress's ability to regulate for the population at large), the argument for congressional authority over federal convicts in the § 1120 context may be somewhat more attenuated. But even though the

---

[21] *See, e.g., Johnson*, 529 U S. at 700 (characterizing "postrevocation sanctions as part of the penalty for the initial offense" rather than "construing revocation and reimprisonment as punishment for the violation of the conditions of supervised release"), *United States v. Meeks*, 25 F 3d 1117, 1120–23 (2d Cir 1994) (canvassing arguments and concluding that "any provision for punishment for a violation of supervised release is an increased punishment for the underlying offense")

analogy is imperfect, we believe the interests underlying Congress's well-established practice of authorizing release conditions, including compliance with state criminal laws, supports our conclusion that Congress has a legitimate penological interest in regulating the conduct of escaped life-sentenced prisoners sufficient to justify federal proscription of all post-escape killings.

We recognize that both *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), reflect a heightened judicial sensitivity to the breadth of federal regulatory power. We do not, however, read these decisions as calling into serious question this particular justification for § 1120's application to non-escape-related killings. In embracing a more restrictive view of Congress's Commerce Clause power than that reflected in prior case law, the Court expressed its concern that allowing Congress to "pile inference upon inference," *Lopez*, 514 U.S. at 567, in order to connect an intrastate activity to interstate commerce would "convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States," *id.*, and threaten to obliterate the "distinction between what is truly national and what is truly local." *Morrison*, 529 U.S. at 617–18. The Court was particularly concerned that an expansive understanding of the commerce power would threaten the states' traditional authority to regulate intrastate criminal activity. *See Lopez*, 514 U.S. at 561 n.3 ("Under our federal system, the 'States possess primary authority for defining and enforcing the criminal law.' ") (citation omitted); *Morrison*, 529 U.S. at 618 ("[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").

The context in which these concerns were voiced was quite different, however, and such concerns have significantly less force as applied to § 1120's proscription of non-escape-related killings by escapees from life imprisonment. First, one need not "pile inference upon inference" in any troublesome manner to justify this proscription. As explained in Part I, Congress's authority to construct and operate a criminal justice system in general and a penal regime in particular is well grounded and unquestioned. Sustaining § 1120's application to non-escape-related killings requires only one additional step, the recognition that even such killings undermine Congress's legitimate penological and custodial interests in protecting the public from violent federal convicts who should be in prison rather than at large.

Second, the justification for upholding this application of § 1120 would not come close to supporting a general congressional police power. To be sure, the broadest conception of this justification might give one pause. Taken to its extreme, this incapacitation rationale could permit Congress to punish any public-threatening conduct by any federal escapee, whether the conduct is life-threatening or not, whether the escapee is a felon or a misdemeanant, and whether the frustrated prison sentence is a term of life or a term of months. Indeed, this rationale

might extend as well to some or perhaps even all federal convicts placed on probation or supervised release, since they might also pose some threat to public safety during their terms of sentence. Thus perhaps Congress could extend the rationale offered here for § 1120's application to non-escape-related killings to criminalize (with appropriate due process protections) a great deal of conduct by probationers or parolees that heretofore has been governed solely by state law.

But this concern about the incapacitation rationale's potential breadth does not counsel strongly against § 1120's constitutionality, for two reasons. First, even the largest class of persons plausibly subject to federal regulation under this rationale — all federal convicts during the entire period of their sentences — remains relatively small, encompassing only those persons who have already been prosecuted, convicted, and sentenced for violating a valid federal criminal statute. Thus the broadest possible application of this justification for § 1120 would hardly approach a general police power of the sort rejected by the Court in *Lopez* and *Morrison*. Second, the rationale might not extend so broadly. Arguably, the shorter the sentence and the less serious the post-release conduct, the less that conduct contravenes Congress's penological and custodial interests. The rationale for federal criminal proscription of such conduct might extend only to serious misconduct by those serving long custodial sentences. This would limit the ultimate scope of Congress's regulatory authority over federal convicts and assuage the concerns reflected in *Lopez* and *Morrison*, and nevertheless such authority would still cover all of the conduct proscribed by § 1120, since Congress's penological and custodial interests are clearly at their zenith when applied to the narrow realm of killings by life-sentenced escapees. When a life-sentenced federal prisoner escapes and kills, the federal government's failure to maintain physical custody is indisputably a but-for cause of the death, no matter when or why it occurs, and Congress's interest in ensuring that society is permanently protected from a dangerous felon has been frustrated in the most egregious manner possible.[22]

---

[22] Assuming *arguendo* that a court found this defense unpersuasive and concluded that § 1120's application to non-escape-related killings does *not* itself serve legitimate federal interests, this application might nevertheless be defended on the ground that *most* of the statute's applications are constitutional and thus § 1120 is not so overbroad as to warrant invalidation. One might argue that a high percentage of escapee killings are escape-related; indeed, if the category of "killings to avoid detection" is very broadly defined, perhaps most killings could plausibly be characterized as lying within it. Moreover, Congress might believe that even in those cases where a sufficient connection between a killing and recapture- or detection-avoidance exists to justify federal jurisdiction, the connection will frequently be quite difficult for prosecutors to prove Thus § 1120's application to all killings might be defended on the ground that this coverage is only slightly overbroad, and its overbreadth is justified as enabling prosecutors to avoid facing some difficult proof problems. *Cf Westfall v. United States*, 274 U.S. 256, 259 (1927) ("[W]hen it is necessary in order to prevent an evil to make the law embrace more than the precise thing to be prevented ⌐ it may do so.")

This defense, while plausible, also raises some difficulties First, the fact that Congress has neither articulated this rationale nor made findings about its empirical plausibility will likely give courts some pause. A court might be reluctant to assume that most escapee killings are escape-related without any congressional findings to that effect. Moreover, it is uncertain whether a court would characterize the desire to avoid making the prosecutor prove facts that otherwise seem necessary to establish federal jurisdiction as a legitimate federal interest.

## IV. CONCLUSION

Congress has clear constitutional authority to proscribe killings by escaped life-sentenced inmates which either effectuate or prolong the escape. Whether Congress has power to proscribe killings that are unrelated to such efforts presents a novel question. We believe that Congress's penological and custodial interests in ensuring the incapacitation of life-sentenced inmates notwithstanding their escape from prison provide a compelling argument for upholding § 1120's constitutionality even with respect to non-escape-related killings.

RANDOLPH D. MOSS
*Acting Assistant Attorney General*
*Office of Legal Counsel*
